UNITED STATES of America,
Plaintiff,

v.

Mitchel D. COHEN, dba The White
House, Defendant.

Civ. A. No. 71–352.

United States District Court,
S. D. Ohio, E. D.

Dec. 28, 1973.

William W. Milligan, U. S. Atty., W. Robinson Watters, Asst. U. S. Atty., Columbus, Ohio, Irving Jaffe, Acting Asst. Atty. Gen., Civil Div., Justice Dept., Washington, D. C., for plaintiff.

Josiah H. Blackmore, Columbus, Ohio, for defendant.

## OPINION AND ORDER

KINNEARY, Chief Judge.

This matter is before the Court on the complaint filed by the government and the answer of the defendant, Mitchel D. Cohen. The case was tried to the Court on August 8, 1973.

This action was commenced under the provisions of the Economic Stabilization Act of 1970. Jurisdiction of the Court is invoked under 28 U.S.C. § 1345 and Sections 209 and 211 of the Economic Stabilization Act of 1970.

The government contends that the defendant, a landlord in Columbus, Ohio raised his rents in violation of the Act and the orders and regulations promulgated thereto. The defendant denies that the rent was increased.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. The defendant is the owner of a rooming house known as The White House and located at 153 East Twelfth Avenue in Columbus, Ohio. The defendant purchased the building in 1964 and has operated it as a rooming house for girls.

2. The White House is a four story building with eleven rooms for rent on

the first, third and fourth floors. The second floor contains four rooms for rent plus a caretaker's apartment and a large lobby. Each floor has a kitchen and two bathrooms. Of the thirty-seven rooms in the house, thirty-three are approximately twelve feet by twelve feet, while the remaining four rooms are approximately twelve by fifteen feet. Each of the smaller rooms contains the same basic color coordinated furniture. The building is air conditioned.

3. From 1964 until 1969 defendant was an approved university rooming house. Under this arrangement, defendant's tenants were provided by the Dean of Women of Ohio State University because the university did not at that time have sufficient dormitory space to house all of the students university regulations required to live on campus. The university had the right to inspect defendant's building and the defendant was required to enforce university rules. Under this contract, the defendant could only rent to tenants provided by the Dean of Women of Ohio State University.

4. Under university regulations, the maximum number of students the defendant could house was seventy-eight. The defendant's building was fully occupied while he was under contract with the university. The defendant placed two girls in each of the smaller rooms and three girls in each of the larger rooms. Each of the girls was charged Fifty Dollars ($50.00) per month rent regardless of the size of the room.

5. The defendant terminated his contract with the university in 1969. This termination was caused by a drop in the number of students sent to him by the university. This drop was in turn caused by the opening of two new campus dormitories and by a liberalization of university regulations governing students living off campus.

6. During 1969 and 1970 defendant's rate of occupancy dropped drastically. As a result, most of defendant's smaller rooms that were rented housed only one tenant. By the summer of 1970, all of the defendant's smaller rooms that were rented housed only one tenant.

7. Potential tenants who visited The White House in 1970 and 1971 were told that the smaller rooms were "singles." They were not told that the management could compel them to take a roommate. In fact, no girl in a smaller room had a roommate at any time during 1970 or 1971.

8. On July 31, 1971 defendant sent individual notices to each tenant which stated:

Due to the numerous increases we have had throughout the past several years in utilities, taxes, etc., we have no alternative but to *raise the rents* in keeping current with today.

EFFECTIVE SEPTEMBER 1, 1971:

All single occupied rooms will rent for $65.00 per month.

All double occupied rooms will rent for $50.00 per month, each occupant. [Emphasis added.]

9. Sometime after this notice was distributed the defendant's wife prepared a second notice which stated:

WHITEHOUSE RESIDENTS

We have previously rented all rooms for double occupancy and the four larger rooms (1 on each floor) for triple occupancy.

This is the first time we have rented the rooms for occupancy of a sole resident and the four large rooms for double occupancy. If you want to go back to the original set-up, O.K. All beds will be bunked as originally set up and are not to be taken down. All rooms will be subject to double occupancy and the four large rooms to triple occupancy.

We have no previous listing for the present type of occupancy.

This notice was posted on a door where other notices were frequently placed and was not sent to each individual tenant. The witnesses disagree as to when this

second notice was posted. However, the Court believes that this notice was posted after the President announced the price freeze.

10. After September 1, 1971 the defendant collected $65.00 per month from each tenant in a small room. The defendant did not improve or in any way change the building or the services provided by management after September 1.

11. The defendant continued to collect $65.00 per month rent from each tenant in a "single" during both Phase I and Phase II.

## Discussion

On August 15, 1971 the President announced a ninety day freeze on wages and prices. This freeze included rents. *See* Exec. Order No. 11615 (August 15, 1971). Freeze regulations provided that rents could not be increased above the highest rent charged for the same or comparable property during the thirty day base period from July 16, 1971 to August 14, 1971. *See* 36 F.R. 16515 (August 21, 1971). Therefore, the ceiling rent for defendant's rooms was $50.00 per month during Phase I.

New economic controls were in effect during Phase II. This period began December 28, 1971 and ended January 11, 1973. Rent increases above Phase I ceiling prices were permitted under Phase II if certain regulations were followed. The defendant concedes that he never complied with these regulations.

■ The primary question before the Court is whether the defendant increased his rent in violation of Phase I and Phase II regulations. The defendant contends that he did not increase his rent. In the alternative, defendant argues that even if he did increase his rent, such an increase was permitted by Phase I regulations.

The defendant contends that the smaller rooms were converted from double to single occupancy on September 1, 1971, the date of the rent increase, and that, therefore, the rent per room per month actually dropped from $100.00 ($50.00 per tenant) to $65.00. However, this contention ignores the reality of defendant's rate of occupancy during 1970 and 1971. During this period, no girl had a roommate in a smaller room. In addition, no tenant was told that management reserved the right to place another tenant in the room. Therefore, the defendant had been renting his smaller rooms as singles for more than one year at the time of this supposed change of policy. The Court also observes that the defendant himself referred to the change in rent as a rent increase.

■ The defendant further contends that even if the change in rent was a rent increase, such an increase was authorized under the freeze regulations because he was not making a profit during the base period. *See* 6 C.F.R. 483. However, the defendant never requested relief from the Price Commission or any other agency as required by the same notice cited by defendant as authority for his increase. If the defendant was really operating at a loss, then he should have requested authorization from the Price Commission before he increased his rent.

Section 209 of the Economic Stabilization Act of 1970 provides that a court may order restitution of any moneys received in violation of an order or regulation. Since the defendant's tenants were required to pay rents in excess of the base rent, the Court believes that restitution would be appropriate in this case. In addition, Section 208 of the Economic Stabilization Act of 1970 provides:

.    .    .    .    .    .

(b.) Whoever violates any order or regulation under this title shall be subject to a civil penalty of not more than $2,500 for each violation.

Since the defendant has violated the rent control provisions of the freeze regulations, the Court shall impose a civil penalty of $1,500.00.

Within twenty (20) days of the date this order is filed, the government, after

consulting the defendant, shall submit to the Court pursuant to Rule 58 of the Federal Rules of Civil Procedure, a judgment entry incorporating the provisions of the order, establishing procedures for restitution and specifically setting forth the name of each tenant who resided at the White House during the period in question and the amount of money she is due as a refund.

### Conclusions of Law

1. This Court has jurisdiction over the subject matter of this action under the provisions of Sections 209 and 211 of the Economic Stabilization Act of 1970.

2. The defendant illegally increased his rent above the base rent established by the regulations and orders adopted pursuant to the Act.

3. The Court orders the defendant to make full restitution to each resident of The White House during the period in question and to pay a civil penalty of $1,500.00. The government shall prepare a judgment entry in accordance with the provisions of this opinion.

It is so ordered.